**David HENDERSON**

v.

**Manuel LUJAN, Jr., Secretary of the United States Department of Interior, et al., Appellants.**

**No. 91–5258.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 21, 1992.

Decided May 22, 1992.

As Amended May 22, 1992.

John D. Bates, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., R. Craig Lawrence, and John C. Cleary, Asst. U.S. Attys., were on the brief, for appellants.

James Matthew Henderson, Sr. for appellee.

Arthur B. Spitzer and Elizabeth Symonds, were on the brief for amicus curiae, American Civil Liberties Union and American Veterans Committee, urging that the decision of the District Court be affirmed.

Before: SILBERMAN, WILLIAMS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

Separate concurring opinion filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Appellee David Henderson is a Christian evangelist who distributes free religious literature in public places. He attempted to distribute his leaflets on January 21, 1991 and May 16, 1991 on city sidewalks near the Vietnam Veterans Memorial wall. The sidewalks he chose—to the west of the wall bordering Henry Bacon Drive and to the north bordering Constitution Avenue— turned out to be within an area officially designated by the National Park Service as the Vietnam Veterans Memorial, namely the hatched area shown within the inner line of the shaded boundary zone on the map below.[1] (The Memorial wall is not visible from these sidewalks.)

---

1. The official description is as follows:
    Vietnam Veterans Memorial area extending to and bounded by the south curb of Constitution Avenue on the north, the east curb of Henry Bacon Drive on the west, the north ·ide of the north Reflecting Pool walkway on the south and a line drawn perpendicular to Constitution Avenue two hundred (200) feet from the east tip of the memorial wall on the east....
    36 CFR § 7.96(j)(2)(vi) (1991).

Source: Final Rule, 49 Fed.Reg. 39677, 39682 (Oct. 10, 1984).

The double line along Constitution Avenue depicts a 13–foot wide service road that divides the sidewalk into two parallel strips, a very thin one on the north and a broad one on the south.

---

Park Service police threatened to arrest Henderson if he continued leafletting, relying on a regulation that prohibits "[t]he sale or distribution of newspapers, leaflets, and pamphlets" in the entire officially designated area. 36 CFR § 7.96(j)(2)(vi) (1991). The regulation is intended "to maintain an atmosphere of calm, tranquility and reverence" at the Memorial. Final Rule, 49 Fed.Reg. at 39677.

Henderson wished to distribute his pamphlets on these sidewalks during the Desert Storm Victory Parade held on June 8, 1991, so he sued for a temporary restraining order, as well as a preliminary and a permanent injunction, to prevent the Park Service from enforcing the regulation against him. The district court issued a restraining order. It then held an evidentiary hearing on the merits and ultimately issued a permanent injunction. *Henderson v. Lujan,* 768 F.Supp. 1 (D.D.C.1991). The court held that the sidewalks were a traditional public forum, because they varied little from other public sidewalks surrounding the mall area, and, though located at the entrance of the Memorial, were over 100 feet from the Memorial wall itself. The court acknowledged that the speech restriction was content-neutral and left open alternative channels of communication, but found that it was not narrowly tailored enough because "the Park Service's interest in maintaining a tranquil atmosphere at the Memorial does not justify the prohibition against the distribution of free literature". *Id.* at 3. The court stated that its holding did not affect the regulation as applied to the *sale* of literature. *Id.* We agree that the regulation fails the "narrow tailoring" test and therefore affirm the district court.

\* \* \*

■ Appellee's peaceful leafletting activities are clearly protected by the First Amendment. See *United States v. Grace,* 461 U.S. 171, 176, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983); *Schneider v. State,* 308 U.S. 147, 160–64, 60 S.Ct. 146, 150–52, 84

L.Ed. 155 (1939); *Lovell v. City of Griffin,* 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938). To determine the validity of the regulation, as applied to these sidewalks, we start with the traditional determination of whether they are a public forum. Generally, because of their historical association with the exercise of free speech, streets, parks, and sidewalks are often viewed as quintessential examples. See, e.g., *Grace,* 461 U.S. at 177, 103 S.Ct. at 1706. The two sidewalks here appear to be classic instances. They are physically indistinguishable from ordinary sidewalks used for the full gamut of urban walking. They are used by thousands of pedestrians every year, including not only Memorial visitors but also people going to other places. The record provides no precise figures on the volume of each type of use, but the cases generally focus on physical differentiations rather than on the scale of the area's various uses. See, e.g., *United States v. Kokinda,* 497 U.S. 720, 110 S.Ct. 3115, 3120, 111 L.Ed.2d 571 (1990) (plurality opinion) (disputed sidewalk leading only to a post office held not the sort of "thoroughfare" traditionally open for expressive activity). Even if the public forum resolution would be different if non-Memorial use were insubstantial, the sidewalks' apparent similarity to ones of the classic variety at a minimum put the burden on the government to show that the use was overwhelmingly specialized. See *Grace,* 461 U.S. at 177, 103 S.Ct. at 1707 (" 'public places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, *without more,* to be 'public forums.' ") (emphasis added); *Frisby v. Schultz,* 487 U.S. 474, 480–81, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988) ("Ordinarily, a determination of the nature of the forum would follow automatically from this identification [as street or sidewalk]").

The government notes one special physical characteristic of the disputed portion of the Constitution Avenue sidewalk—that it is separated from the main street itself by a strip about 13 feet wide. But as this feature of the Constitution Avenue sidewalk remains unchanged as the sidewalk passes in and out of the official boundaries of the Memorial, it hardly serves to mark off any special use. In this respect the two sidewalks resemble those around the Supreme Court, which the Court found to be a public forum, noting that "[t]here is no separation, no fence, and no indication whatever to persons stepping from the street ... that they have entered some special type of enclave". *Grace,* 461 U.S. at 179–80, 103 S.Ct. at 1708. The mere fact that a sidewalk abuts property dedicated to purposes other than free speech is not enough to strip it of public forum status. *Id.* at 180. We do not, of course, reach the status of the curvilinear paths leading to the Memorial wall; their evidently more specialized use may outweigh the attributes that would otherwise mark them as public forums. See *Kokinda,* 110 S.Ct. at 3120–21 (plurality opinion).

The government seeks to establish the nonforum character of the sidewalks by reference to "the intent of the National Park Service and its consistent practice of forbidding expressive conduct on the walkways". Appellants' Brief at 27. It invokes *Grace*'s observation that sidewalks "are among those areas of public property that traditionally have been held open to the public for expressive activities," 461 U.S. at 179, 103 S.Ct. at 1708, to support an argument that the Park Service has here established a contrary tradition.

The argument misconceives the role of government intent and practice. In one sense, tradition operates at a very high level of generality, establishing a working presumption that sidewalks, streets and parks are normally to be considered public forums. See discussion above. Traditions specific to a particular area work differently. Common sense and the cases make clear that when government has dedicated property to a use inconsistent with conventional public assembly and debate—as the Court has said of sidewalks within a military base, see *Greer v. Spock,* 424 U.S. 828, 838, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505 (1976)—then the inconsistency precludes classification as a public forum.

But government cannot establish the inconsistency simply by declaring it and by enforcing restrictions on speech. It is quite true that in *Greer* the Court distinguished its earlier decision in *Flower v. United States,* 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972), on the ground that in *Flower* the base authorities "had 'abandoned any claim [of] special interests in who walks, talks, or distributes leaflets on the avenue,'", 424 U.S. at 837, 96 S.Ct. at 1217 (quoting *Flower*), whereas in *Greer* there had been no such abandonment. But the *Greer* Court also dismissed *Flower* as a case where the Court had understood that the disputed avenue "was a public thoroughfare in San Antonio no different from all the other public thoroughfares in that city." *Id.* at 835, 96 S.Ct. at 1216. And later cases confirm that *Flower* and *Greer* do not establish that time, place, or manner restrictions can bootstrap themselves into validity by their mere existence, even if prolonged. See *United States Postal Service v. Greenburgh Civic Ass'ns,* 453 U.S. 114, 133, 101 S.Ct. 2676, 2687, 69 L.Ed.2d 517 (1981) (government "may not by its own *ipse dixit* destroy the 'public forum' status of streets and parks which have historically been public forums"); *Grace,* 461 U.S. at 180, 103 S.Ct. at 1708 ("Nor may the government transform the character of the property by the expedient of including it within the statutory definition of what might be considered a nonpublic forum parcel of property."). Conversely, where time, place or manner restrictions would otherwise be valid because of inconsistencies between public assembly and communication and the property's actual use, we do not read *Greer* and *Flower* as authorizing courts to strike them down merely because the government has for a time stayed its hand. Cf. *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983) (noting that if government designates a place as a public

forum, it "is not required to indefinitely retain the open character of the facility"). The Service's speech regulations, then, regardless of their longstanding character, do not undermine the evidence supporting our conclusion that the sidewalks here are a public forum.

If the restrictions here qualify as ones of time, place, or manner, they can be upheld if they are "narrowly tailored to serve a significant governmental interest, and ... leave open ample alternative channels for communication of the information'". *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) (quoting *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)). Though the cases speak of a third criterion, that the restrictions must be "justified without reference to the content of the regulated speech," that criterion will always be satisfied by true "time, place or manner" restrictions, which would hardly be such unless justified by "purposes unrelated to the content of expression", see *Ward v. Rock Against Racism,* 491 U.S. at 791, 109 S.Ct. at 2754. See also p. 1184 below (discussing character of the government's asserted interest).

As the regulation on its face makes no content distinction, prohibiting distribution of *all* "newspapers, leaflets, and pamphlets", it appears to be a genuine regulation of time, place or manner. Appellee and amici assert—for the first time on appeal—that the regulation has been applied inconsistently, pointing to the Park Service's distribution of its own pamphlet about the Memorial. See Appellee's Brief at 25 n. 14; Brief of American Civil Liberties Union et. al., amici curiae at 18–22. As this argument was not raised below, we do not consider it here. See *District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1084–85 (D.C.Cir.1984).[2]

---

**2.** The argument is questionable, as distribution of the Park Service guide to Memorial visitors is not inconsistent with the government's interest in maintaining the tranquility of the setting. The argument would be more persuasive if Henderson had been singled out as an object of

enforcement because of his message, see, e.g., *Ward v. Rock Against Racism,* 491 U.S. at 791, 109 S.Ct. at 2753; *City Council v. Taxpayers for Vincent,* 466 U.S. 789, 804, 104 S.Ct. 2118, 2128, 80 L.Ed.2d 772 (1984), but no such claim is made.

Nor do we decide whether Henderson and other leafletters have access to adequate other channels of communication. As Henderson himself has not disputed the district court's finding to the contrary (although amici have, see ACLU Brief at 28–30), and the ban fails the narrow tailoring requirement in any case, see below at pp. 1184–85, we need not resolve the question.

■ Next, we consider whether the government asserts a substantial interest. It explains that the purpose of the leafletting ban is to promote "an atmosphere of calm, tranquility and reverence in the vicinity of ... the Vietnam Veterans Memorial." Final Rule, 49 Fed.Reg. at 39680. This interest in maintaining a tranquil mood at the Memorial wall is similar to ones that the Supreme Court and this court have recognized as substantial. For example, in *Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), the Court held that an ordinance prohibiting picketing in front of a particular individual's home did not violate the First Amendment. The stated purpose of the statute was to protect the integrity of the home and people's feelings of "well-being, tranquility, and privacy", *id.* at 477, 108 S.Ct. at 2498 (quoting ordinance); the Court found that interest significant both in terms of "the unique nature of the home" and the concomitant "protection of the unwilling listener", *id.* at 484, 108 S.Ct. at 2502. And in *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), it found that the "visual assault" on citizens by signs posted on public property was a "significant substantive evil within [Los Angeles's] power to prohibit." *Id.* at 807, 104 S.Ct. at 2130. Likewise, in *White House Vigil for the*

*ERA Committee v. Clark*, 746 F.2d 1518, 1534–38 (D.C.Cir.1984), we found the Park Service's interest in preserving the public's view of the White House from Pennsylvania Avenue and Lafayette Park substantial enough to justify a ban on displaying signs in the center of the sidewalk in front of the White House. Values are no less significant for being subtle, intangible and nonquantifiable.[3]

The tranquil, contemplative mood at the Memorial wall—perhaps "awe" captures it better—would be affected by the activity of any leafletters, regardless of their message. Thus, the government's interest even on the nearby sidewalks is not the illegitimate one of protecting people from offensive messages. Compare, e.g., *United States v. Eichman*, 496 U.S. 310, 318–19, 110 S.Ct. 2404, 2410, 110 L.Ed.2d 287 (1990); cf. *Cohen v. California*, 403 U.S. 15, 21–22, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971); *Cantwell v. Connecticut*, 310 U.S. 296, 309–11, 60 S.Ct. 900, 905–06, 84 L.Ed. 1213 (1940).

■ The restriction nonetheless fails the test of "narrow tailoring". Despite the seemingly mathematical character of the metaphor, the Supreme Court in fact applies it as a balancing test, inquiring whether the restriction "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *Ward v. Rock Against Racism*, 491 U.S. at 799, 109 S.Ct. at 2758. Leafletting on these sidewalks appears to us to have too minimal an impact on tranquility at the Memorial to justify the ban's effect on speech. The sidewalks are remote from the Memorial: the Henry Bacon Drive walkway is 109 to 162 feet from the near-

---

**3.** Of course, recognition of aesthetic values as significant government interests does not determine whether particular regulations designed to serve those interests will survive First Amendment scrutiny. Even a content-neutral regulation, for example, as here, may fail for want of adequate "tailoring". See, e.g., *Grace*, 461 U.S. at 182, 103 S.Ct. at 1709 ("We do not denigrate the necessity to protect persons and property or to maintain proper order and decorum within the Supreme Court grounds, but we do question whether a total ban on carrying a flag, banner,

or device on the public sidewalks *substantially serves these purposes.*") (emphasis added); *id.* at 183, 103 S.Ct. at 1710 (noting that although it did "not discount the importance of" preserving the Supreme Court's appearance of political independence, the Court was "unconvinced that the prohibitions ... that are at issue here *sufficiently serve that purpose* to sustain its validity insofar as the public sidewalks on the perimeter of the grounds are concerned.") (emphasis added). Obviously the government cannot assert a ubiquitous interest in tranquillity.

est part of the Memorial wall, and the Constitution Avenue walkway is even further away, 219 to 260 feet from the nearest part of the wall. To be sure, the Park Service seeks to protect the entrance to the Memorial grounds, and many visitors approach it via Henry Bacon Drive or Constitution Avenue. But, accepting the Park Service's judgment that the sidewalks function as an entrance to the Memorial, the value of serenity at these locations is already severely compromised, both by the presence of many pedestrians not visiting the Memorial and by the constant flow of vehicles, including trucks, along Constitution Avenue itself and even within the 13–foot wide service road lying between Constitution and the sidewalk. As the Supreme Court found the restrictions on the sidewalk around its building "no more necessary for the maintenance of peace and tranquility ... than on any other sidewalks in the city," *Grace*, 461 U.S. at 182, 103 S.Ct. at 1710, we conclude that the leafletting ban here is only barely more necessary for preserving tranquility at the Vietnam Veterans Memorial than is prohibiting leafletting on other city sidewalks.

Although the government argues that the Park Service is better suited than we are to draw the boundary lines of the Memorial, Gov't Brief at 33–34; Reply Brief at 6, we cannot defer to its judgment on the constitutional question. The government relies on a passage from *Clark v. Community for Creative Non–Violence*, 468 U.S. at 299, 104 S.Ct. at 3072, where the Supreme Court noted that it did not "believe ... that either *United States v. O'Brien* [391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)] or the time, place, or manner decisions assign to the judiciary the authority to replace the Park Service as the manager of the Nation's parks or endow the judiciary with the competence to judge how much protection of park lands is wise and how that level of conservation is to be attained". *Clark*, however, involved a general restriction on conduct with incidental effects on expression (a ban on camping in certain parks), not, as here, a regulation that directly burdens certain forms of speech but furthers the government's legit-imate interests only minimally. Moreover, the *Clark* sentence appeared in a passage directed at rejecting an argument that in this context narrow tailoring requires the government to use the least speech-restrictive alternative. *Ward v. Rock Against Racism* confirms a narrow reading of *Clark*'s disclaimer of judicial authority. There, in clarifying the same passage from *Clark*, the Court emphasized that time, place or manner regulations are not valid if "a substantial portion of the burden on speech does not serve to advance [the government's] goals." 491 U.S. at 799, 109 S.Ct. at 2758. This is hardly consistent with the government's suggestion of almost completely deferential review.

Finally, we note that the only issue here is the restriction on leafletting. As the Supreme Court recognized in *Kokinda*, free distribution of literature is far less disruptive than solicitation. The five justices in the majority relied in part on the distinction between the two forms of speech to uphold a statute prohibiting solicitation:

> [C]onfrontation by a person asking for money disrupts passage and is more intrusive and intimidating than an encounter with a person giving out information. One need not ponder the contents of a leaflet or pamphlet in order mechanically to take it out of someone's hand, but one must listen, comprehend, decide and act in order to respond to a solicitation.

*Kokinda*, 110 S.Ct. at 3123 (plurality opinion); see also *id.* at 3126 (Kennedy, J., concurring in the judgment). Following the same rationale, the Second Circuit recently distinguished between two speech restrictions at New York City's airports, a ban on solicitation, which it upheld, and one on leafletting, which it invalidated. See *International Society for Krishna Consciousness, Inc. v. Lee*, 925 F.2d 576, 582 (2d Cir.1991), *cert. granted*, —— U.S. ——, 112 S.Ct. 855, 116 L.Ed.2d 764 (1992). Here we invalidate only the regulation's application to free distribution of literature; its application to solicitation is not before us.

\* \* \*

**1186**

The Park Service's regulation prohibiting free distribution of literature on the Constitution Avenue and Henry Bacon Drive sidewalks bordering the Vietnam Veterans Memorial violates the First Amendment. Accordingly, the judgment of the district court is

AFFIRMED.

STEPHEN F. WILLIAMS, Circuit Judge, concurring:

I continue to believe that the "public forum" classifications artificially complicate the judicial assessment of time, place or manner restrictions. See *Community for Creative Non–Violence v. Turner*, 893 F.2d 1387, 1397–99 (D.C.Cir.1990) (concurring opinion). The present case seems a useful illustration; we would reach exactly the same result without public forum analysis. Whether the court is applying the "three-pronged" test for a time, place or manner restriction in a public forum, or a "reasonableness" test for such a restriction elsewhere, the key issue is the compatibility of the forbidden speech with the purposes to which the site is dedicated. Thus, in evaluating the solicitation ban in *Kokinda,* both the four-justice plurality and Justice Kennedy, concurring, addressed the compatibility of solicitation with the intended uses of the Post Office entrance walk, compare 110 S.Ct. at 3122–24 (plurality), with *id.* at 3125–26 (Kennedy, J.), though Justice Kennedy assumed that the walk might be a public forum and the plurality affirmatively found the opposite. Indeed, here the main role of "forum" analysis has been to extend the briefs, as both parties (necessarily) addressed the sidewalks' characteristics both in the forum analysis and then in assessment of the ban; in addition, both briefs made that assessment under two assumptions, the existence and the non-existence of a public forum. And while forum analysis adds the allure of seemingly discrete analytic steps, the decisions suggest, as I argued earlier, that it adds little in real predictability.