# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued November 9, 2011    Decided July 13, 2012

No. 10-5337

INITIATIVE AND REFERENDUM INSTITUTE, ET AL.,
APPELLANTS

v.

UNITED STATES POSTAL SERVICE,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:00-cv-01246)

---

*David F. Klein* argued the cause for appellants. With him on the briefs were *Mark S. Davies*, *Matthew G. Jeweler*, and *Arthur B. Spitzer*.

*Alice Neff Lucan* and *René P. Milam* were on the brief for *amici curiae* Newspaper Association of America, et al. in support of appellants.

*Marina Utgoff Braswell*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Ronald C. Machen*, *Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: HENDERSON, BROWN, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

Concurring opinion filed by *Circuit Judge* BROWN.

GRIFFITH, *Circuit Judge*: This appeal is the latest step in a long-running controversy over the use of post office sidewalks to gather signatures on petitions. Originally a dispute over a ban on soliciting signatures on all post office property, the issues in the case have changed in response to a decision of ours and subsequent revisions to Postal Service regulations. Before us now is a facial challenge to a ban on collecting signatures on post office sidewalks that do not run along public streets. We agree with the district court that the ban does not violate the First Amendment.

I

In 1998, the Postal Service banned "soliciting signatures on petitions" on "all real property under the charge and control of the Postal Service." 39 C.F.R. § 232.1(a), (h)(1) (2002). Violations are punishable by a criminal fine and imprisonment. *Id.* § 232.1(p)(2).

The appellants use sidewalks on postal property to circulate petitions aimed at placing initiatives and referenda on state and local election ballots. In 2000, they brought a facial challenge to the 1998 ban, arguing it violated the First Amendment. Following discovery, both parties moved for summary judgment. At a hearing on those dueling motions, the Postal Service announced that the ban would not extend to sidewalks that form the perimeter of post office property and

are indistinguishable from adjacent public sidewalks,[1] and that the regulation would be enforced only against the collecting of signatures, not the mere asking for them. *See* Mots. Hr'g Tr. 29, 32-34, Sept. 24, 2002. The Postal Service also said it would "issue a bulletin to its postmasters directing them to adhere to this changed position." *Initiative & Referendum Inst. v. U.S. Postal Serv.*, No. 00-1246, Order at 1 (D.D.C. Sept. 26, 2002).

The district court granted summary judgment for the Postal Service, holding that the regulation, as narrowed by the newly announced enforcement policy, was a reasonable time, place, or manner restriction that would pass constitutional muster even on sidewalks that were public forums. *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 297 F. Supp. 2d 143, 154 (D.D.C. 2003). Reaching that conclusion, the district court did not need to decide if they were.

We reversed the district court, holding that the ban would be an impermissible restriction on expressive activity if postal sidewalks were public forums because it was not narrowly tailored to target disruptive activity and did not allow for petitioning anywhere on postal property. *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299, 1306-07 (D.C. Cir. 2005). We remanded the case for the district court to determine whether the ban reached "a substantial number"

---

[1] We refer to these as *Grace* sidewalks. In *United States v. Grace*, 461 U.S. 171 (1983), the Supreme Court held that the "sidewalks forming the perimeter of the Supreme Court grounds" are traditional public forums, places where expressive activity is lightly regulated, because they are "indistinguishable from any other sidewalks in Washington, D.C." *Id.* at 179-80.

of public forums.[2] *Id.* at 1313. To guide the district court, we noted that interior postal sidewalks "may be hard to categorize" but that *Grace* sidewalks are surely public forums where the regulation may not be enforced. *Id.* at 1313-14. Contrary to the argument of the Postal Service that its new enforcement policy corrected the regulation's defect as to *Grace* sidewalks, we held that placing them beyond its reach was not a plausible construction of a regulation whose express terms still applied to *all* postal property. *Id.* at 1317-18. We also identified a different problem with the regulation: Even in nonpublic forums restrictions must be reasonable, and a ban on merely asking for signatures would not be. *Id.* at 1314-16. The Postal Service's new enforcement policy, however, remedied that infirmity by plausibly construing the ban to bar only the actual collection of signatures. *Id.* at 1317.

While the matter was before the district court on remand, the Postal Service amended its regulations to account for our discussion of the new enforcement policy. The 2010 regulations prohibit "collecting" signatures, but not "soliciting" them, on all postal property other than *Grace* sidewalks. 39 C.F.R. § 232.1(a), (h)(1) (2010) (prohibiting "collecting signatures on petitions" on all postal property except "sidewalks along the street frontage of postal property . . . that are not physically distinguishable from adjacent municipal or other public sidewalks").

Which brings us to the present controversy: The appellants argue that § 232.1(h)(1) is still unconstitutional on

---

[2] We explained that the appellants could sustain their facial challenge to the regulation by showing that it restricts "a substantial amount of protected free speech, judged in relation to [its] plainly legitimate sweep." *Initiative & Referendum Inst.*, 417 F.3d at 1312 (quoting *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (citation and internal quotation marks omitted)).

its face because the sidewalks to which it applies are public forums. In response to the district court's request for a more complete factual record, the parties sent a questionnaire to selected postmasters asking about the nature and frequency of expressive activity on various types of postal sidewalks. The appellants argued that the survey results showed that many interior sidewalks at post offices are public forums and moved for summary judgment on that ground. And even if they were not, the appellants claim the regulation still violates the First Amendment because it is unreasonable. The appellants also asked the district court to enjoin enforcement of the regulation on *Grace* sidewalks. The Postal Service countered with its own motion for summary judgment, arguing that the regulated sidewalks are not public forums and the regulation is reasonable. The district court sided with the Postal Service and also held that the express exemption of *Grace* sidewalks from the regulation mooted the request for injunctive relief. *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 741 F. Supp. 2d 27, 35, 41 (D.D.C. 2010). This appeal followed. We exercise jurisdiction pursuant to 28 U.S.C. § 1291.

II

The first question we must decide is whether interior postal sidewalks are public forums. It is hard to imagine many activities more central to the purpose of the First Amendment than collecting signatures on a petition with the goal of placing an issue before the electorate. Yet even such a worthwhile endeavor is not altogether free of government regulation when it takes place on government property dedicated to other types of public business.

We analyze restrictions on expressive activity on government property for compliance with the First Amendment under the public forum doctrine. This approach

divides government property into three categories, and the category determines what types of restrictions will be permissible. The "traditional public forum" category consists of property that has "by long tradition or by government fiat . . . been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Quintessential examples are streets and parks, which "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Id.* (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)) (internal quotation marks omitted). In such a forum we subject content-based restrictions on speech to strict scrutiny, but use the less demanding time, place, or manner test to assess content-neutral restrictions. *Id.* A "designated public forum" is property that "the State has opened for use by the public as a place for expressive activity." *Id.* Expressive activity there may be restricted to particular groups or subjects. *Id.* at 46 n.7. A "nonpublic forum" is "not by tradition or designation a forum for public communication." *Id.* at 46. In these places the government may "reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.*

In *United States v. Kokinda*, 497 U.S. 720 (1990), the Supreme Court addressed but did not resolve the question before us: whether interior sidewalks at post offices are public forums. At issue was a Postal Service regulation that prohibited "[s]oliciting alms and contributions" on a sidewalk that led from the parking lot to the front door of the post office building. *Id.* at 722-23 (plurality opinion). Writing for a plurality, Justice O'Connor explained that the forum analysis

turns on more than whether the government property is a sidewalk: "the location and purpose of a publicly owned sidewalk" are key. *Id.* at 727-29. The plurality concluded that this sidewalk was not a public forum because "it [led] only from the parking area to the front door of the post office" and "was constructed solely to provide for the passage of individuals engaged in postal business." *Id.* at 727. Unlike other sidewalks, it was not a "public passageway" meant "to facilitate the daily commerce and life of the neighborhood or city." *Id.* at 727-28. Justice Kennedy concurred in the judgment upholding the regulation but would not join the plurality's conclusion that the sidewalk was not a public forum. Noting there was "a powerful argument" that the sidewalk was "more than a nonpublic forum," he nevertheless found no need to reach that issue because the regulation was in his view a valid time, place, or manner restriction. *Id.* at 737-38 (Kennedy, J., concurring in the judgment).

Five courts of appeals have addressed the status of interior postal sidewalks under the public forum doctrine and all have agreed with the plurality that they are not public forums. *See Del Gallo v. Parent*, 557 F.3d 58 (1st Cir. 2009); *Paff v. Kaltenbach*, 204 F.3d 425 (3d Cir. 2000); *Jacobsen v. U.S. Postal Serv.*, 993 F.2d 649 (9th Cir. 1992); *Longo v. U.S. Postal Serv.*, 983 F.2d 9 (2d Cir. 1992); *United States v. Belsky*, 799 F.2d 1485 (11th Cir. 1986). We join their ranks. No court of appeals has held otherwise, except the Fourth Circuit which was reversed by the Supreme Court in *Kokinda*. *United States v. Kokinda*, 866 F.2d 699 (4th Cir. 1989), *rev'd*, 497 U.S. 720.

Like the *Kokinda* plurality, we recognize that "[t]he dispositive question is not what the forum is *called*, but what *purpose* it serves, either by tradition or specific designation." *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 515 (D.C.

Cir. 2010). We agree with Justice O'Connor that it is not enough to know that the regulated property is a sidewalk. True, we start "at a very high level of generality" where there is "a working presumption that sidewalks, streets and parks are normally to be considered public forums." *Oberwetter v. Hilliard*, 639 F.3d 545, 552 (D.C. Cir. 2011) (quoting *Henderson v. Lujan*, 964 F.2d 1179, 1182 (D.C. Cir. 1992)) (internal quotation marks omitted). But then we must "examine the history and characteristics of the particular property at issue, mindful 'that when government has dedicated property to a use inconsistent with conventional public assembly and debate . . . then the inconsistency precludes classification as a public forum.'" *Id.* (quoting *Henderson*, 964 F.2d at 1182). In this case, the location, purpose, and history of interior postal sidewalks combine to show that they are not public forums.

Their location distinguishes them from "ordinary sidewalks used for the full gamut of urban walking." *Henderson*, 964 F.2d at 1182; *see also Grace*, 461 U.S. at 179. Most lead only to the front door of the post office building, *see Kokinda*, 497 U.S. at 727 (plurality opinion), and a person stepping onto one would generally be aware that he was not on an ordinary sidewalk that runs along a public street, *see Del Gallo*, 557 F.3d at 71. That physical separation from ordinary sidewalks suggests they are subject to greater regulation. *See Int'l Soc'y for Krishna Consciousness, Inc. v. Lee* (*ISKCON*), 505 U.S. 672, 680 (1992) (explaining that "separation from acknowledged public areas may serve to indicate that the separated property is a special enclave, subject to greater restriction").

Interior postal sidewalks also have a different purpose than ordinary sidewalks, which are generally open for "the free exchange of ideas." *See Cornelius v. NAACP Legal Def.*

*& Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985). Like streets, ordinary sidewalks are "not only a necessary conduit in the daily affairs of a locality's citizens, but also a place where people may enjoy the open air or the company of friends and neighbors in a relaxed environment." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 651 (1981). By contrast, interior postal sidewalks are not meant to serve as forums for free expression. They are neither public thoroughfares nor gathering places, *see Kokinda*, 497 U.S. at 727 (plurality opinion), but are typically used only by customers and employees of the post office and are built solely to provide efficient access to the post office, *see id.* at 728; Hintenach Decl. in Supp. of Def.'s Mot. for Summ. J. ¶ 12.

There is no venerable tradition of using these sidewalks for expressive activities. It is no doubt true, as the appellants explain, that in the early days of the Republic post offices were "a favorite gathering place" among townsmen who congregated to discuss the news of the day and gossip. Appellants' Br. 31-36 (quoting RICHARD R. JOHN, SPREADING THE NEWS: THE AMERICAN POSTAL SYSTEM FROM FRANKLIN TO MORSE 161 (1995)); *see also* John Dep. 36:20-37:10, Jan. 4, 2002. But post offices then were not quite the same as post offices now. Historically, a post office consisted of a desk or counter in a store, tavern, or coffeehouse. *See* John Dep. 42:6-43:6; JAMES H. BRUNS, GREAT AMERICAN POST OFFICES 3 (1998); JOHN, *supra*, at 113. "[P]ost offices were rarely located in a freestanding building," and "[a]lmost none were owned by the government outright." JOHN, *supra*, at 113. The history the appellants cite tells us little about interior postal sidewalks, which are a comparatively recent development. *Cf. ISKCON*, 505 U.S. at 680-81 (explaining that the lateness with which the modern air terminal made its appearance

precludes a finding that it has been used for expressive activity "time out of mind").

The appellants argue that interior postal sidewalks are public forums because they are widely used for expressive activity. They contend that the results of the postmaster survey show that much public discourse takes place on postal sidewalks and there is no significant difference between what takes place on *Grace* sidewalks and what takes place on interior postal sidewalks. Appellants' Br. 36-40; *see also* Kadane Decl. 4-5, Mar. 28, 2008. In fact, the survey results show that only about 7% of the postmasters who responded had ever observed people using *Grace* or interior sidewalks for expressive activity. Kadane Decl. Ex. 2 (358 postmasters said that exterior spaces have been used for expressive activities and 4,736 said they have not). Even if all the observed activity occurred on interior sidewalks, we are hard pressed to agree with the appellants that it is a substantial amount. These results do not show that a substantial number of these sidewalks have been used for political activity and expression with "sufficient historical regularity" to make them traditional public forums. *Initiative & Referendum Inst.*, 741 F. Supp. 2d at 37; *see also Del Gallo*, 557 F.3d at 71 (finding that "the Pittsfield Post Office sidewalk has not consistently, historically 'been used for public assembly and debate,' nor was it intended to be used as such" (citation omitted)). Further, "comparing the frequency of expressive activity within the recent past on the two types of sidewalks sheds little, if any, light on the forum status of [interior] sidewalks." *Initiative & Referendum Inst.*, 741 F. Supp. 2d at 38. The relevant inquiry is whether these sidewalks have *historically* been used for public discourse. *Id.* And *Grace* sidewalks are public forums because they are indistinguishable from ordinary sidewalks, not because of the

quantum of expression that happens on them. *Grace*, 461 U.S. at 179.

Nor does the survey show that interior postal sidewalks are designated public forums. That the Postal Service has allowed certain expressive activities on them does not transform them into designated public forums because "[t]he government does not create a public forum by . . . permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Kokinda*, 497 U.S. at 730 (plurality opinion) (quoting *Cornelius*, 473 U.S. at 802) (internal quotation marks and emphasis omitted). There is no evidence in this case that the Postal Service intended to make sidewalks used primarily by customers and employees to get into the post office "generally available" for expressive activity. *See Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998). Because interior postal sidewalks are neither traditional nor designated public forums, we review the regulation's application to them for its reasonableness. *Kokinda*, 497 U.S. at 730 (plurality opinion).

## III

The appellants argue that even if they are nonpublic forums, banning the collection of signatures on interior postal sidewalks is still unconstitutional because it is unreasonable. *Perry*, 460 U.S. at 46 (holding that restrictions on speech in nonpublic forums must be reasonable). A regulation is reasonable if it is consistent with the government's legitimate interest in maintaining the property for its dedicated use. *Id.* at 50-51. And the restriction "need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808. According to the Postal Service, its customers and employees have complained that collecting signatures on postal sidewalks blocks the flow of traffic into

and out of the post office building. The Postal Service also seeks to avoid the appearance of endorsing the group collecting signatures.

The appellants respond that there is no reasonable fit between those interests and the regulation. They think the ban unnecessary because "[d]isorderly conduct" and "imped[ing] ingress . . . or egress" are already proscribed. *See* 39 C.F.R. § 232.1(e). But certainly the Postal Service is free to adopt multiple means to ensure that customers visiting the post office can transact their business unimpeded. *See Initiative & Referendum Inst.*, 417 F.3d at 1309 ("Of course, the availability of other means of accomplishing a governmental objective does not foreclose the government's ability to pursue its chosen course."). In a nonpublic forum the government need not adopt the most narrowly tailored means available. *Cornelius*, 473 U.S. at 809.

The appellants also argue that it is unreasonable to distinguish between soliciting signatures and collecting them because both are equally disruptive. But we previously made that very distinction, looking askance at a ban on pure solicitation, but concluding that a ban on collection would be permissible. *See Initiative & Referendum Inst.*, 417 F.3d at 1314-17. The Postal Service is simply following our lead. Tracking the analysis of the plurality and Justice Kennedy in *Kokinda*, we observed that different consequences are likely to follow from merely asking postal customers for their signatures and actually collecting them. *Id.* at 1317. Collecting contributions involves the type of immediate response the *Kokinda* plurality thought could be reasonably banned because it would cause postal customers to stop, transact the business requested, and thus disrupt the flow of traffic at the post office. *Kokinda*, 497 U.S. at 733-34 (plurality opinion). By contrast, the plurality thought that

distributing a leaflet that merely asked postal patrons for their help posed no such risk and could not reasonably be banned. *Id.* at 734. Justice Kennedy made a similar point when he concluded it would be reasonable to ban a request that naturally leads to an immediate response that would disrupt customer traffic at the post office. *Id.* at 738-39 (Kennedy, J., concurring in the judgment). That distinction, we have already determined, is meaningful, and while a ban on pure solicitation is unreasonable, a ban on collection is not. *Initiative & Referendum Inst.*, 417 F.3d at 1317. That discussion, which the Postal Service followed in crafting the regulation before us, controls our disposition.

IV

We said before that § 232.1(h)(1) could not be enforced on *Grace* sidewalks. They are public forums, and the ban on collecting signatures there is not a reasonable time, place, or manner restriction. *Id.* at 1313-14 (citing *Grace*, 461 U.S. at 180). Although it seemed likely that many post offices had *Grace* sidewalks, making this restraint on protected speech "substantial," we remanded the case for the district court to make that determination. *Id.* at 1314. We also noted that this part of the appellants' challenge "may be pretermitted if the Postal Service amends the regulation to exclude [*Grace*] sidewalks from the prohibition against solicitation." *Id.* at 1318. Based on our decision, the appellants sought to enjoin enforcement of § 232.1(h)(1) on *Grace* sidewalks, but the Postal Service beat them to the punch by amending the regulation to exempt *Grace* sidewalks. The district court ruled, therefore, that the appellants' request was moot. *Initiative & Referendum Inst.*, 741 F. Supp. 2d at 34-35. We agree.

14

"Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies." *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983). "Even where litigation poses a live controversy when filed," a federal court must "refrain from deciding it if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Am. Bar Ass'n v. FTC*, 636 F.3d 641, 645 (D.C. Cir. 2011). The intervening event here is of the Postal Service's own doing. "[G]enerally voluntary cessation of challenged activity does not moot a case," unless "the party urging mootness demonstrates that (1) 'there is no reasonable expectation that the alleged violation will recur' and (2) 'interim relief or events have completely or irrevocably eradicated the effects of the alleged violation.'" *Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997) (quoting *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)).

A challenge to a superseded law is rendered moot unless "there [is] evidence indicating that the challenged law likely will be reenacted." *Id.* The case primarily relied upon by the appellants had just such evidence. *See City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.11 (1982) (noting that the city had announced its intent to reenact the challenged ordinance). There is no evidence in this case to suggest the Postal Service has anything like that in mind. "[T]he mere power to reenact a challenged law is not a sufficient basis on which a court can conclude that a reasonable expectation of recurrence exists." *Nat'l Black Police Ass'n*, 108 F.3d at 349. It is implausible that the Postal Service would have gone through the cumbersome process of amending its regulation to exempt *Grace* sidewalks only to re-amend the regulation after this case is resolved to once again cover them, especially

when we have already said that it would be unconstitutional to do so.

Because the challenged regulation no longer applies to *Grace* sidewalks, the amendment "completely and irrevocably eradicated the effects of the alleged violation." *Id.* at 350. At this point, "declaratory and injunctive relief would no longer be appropriate." *Id.*

## V

The judgment of the district court is

*Affirmed*.

BROWN, *Circuit Judge*, concurring: I join the Court's public forum analysis in full, and given our holding in *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299, 1314–17 (D.C. Cir. 2005), I join my colleagues in acknowledging the Postal Service's scheme of banning signature-collection while permitting signature-solicitation is one we previously approved. After all, as the Court explains, the Postal Service is merely "following our lead" from that case, Majority Op. at 12, since we suggested there that banning only same-place signature-collecting would "cure the problem" posed by an outright ban on solicitation of signatures. 417 F.3d at 1317.

But this half-a-loaf solution seems more persnickety than practical. The harms about which the Postal Service is concerned—the impeding of traffic and the appearance of Postal Service endorsement, Majority Op. at 11–12—and, indeed, all of the harms I can imagine,[1] accrue in the initial, permitted phase of a signature-gathering encounter: the solicitation.

As I imagine an encounter under the current set of regulations, a postal patron will approach the door to a post office. The patron will then be approached by a signature-gatherer and asked to sign a petition, at which point, one of two things will happen: the patron may ignore the signature-

---

[1] For example, Frederick Hintenach, a Postal Service official involved in writing the regulation, testified that "what drove the intrusiveness was the fact that [postal patrons] were *being approached as they were trying to get in and out of the building*." Hintenach Dep. at 85 (emphasis added). This remains permitted. Hintenach went on to say, "I don't think our customers or our employees should be subjected to the opinions of someone else if they don't choose to do so. And referendum and signature collection forces that interaction." *Id.* at 94. The permitted solicitation "forces" that same interaction.

gatherer, giving him the brush-off and walking right into the post office, or seek to sign the petition. All of these interactions are permitted. Once the patron expresses an interest in signing the petition, however, the signature-gatherer will have to explain that postal regulations prohibit collecting signatures in this location, and invite the patron to move to the nearest *Grace* sidewalk to affix his signature.[2]

From the perspective of the uninterested patron, the disruption is the same, collection or no collection. But from the perspective of the interested patron, the disruption is only increased by the awkward two-step required by the regulations—*that* patron must further deviate from her postal business in order to complete her interaction with a signature-gatherer. Whatever doorway impedance is alleviated by moving signature-collection offsite is surely netted out by the necessarily lengthier explanations of the convoluted rules.

Nor does this arrangement dissipate concern about the Postal Service's apparent endorsement of the message of signature-gatherers. Postal patrons are unlikely to make any useful distinction on this score between soliciting signatures and collecting them.

When the Supreme Court has evaluated similar speech restrictions, it has only encountered bans on solicitation, not bans on *collection* where solicitation remains permitted. *Compare Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,

---

[2] Of the 24 states that allow citizen initiatives, 18 require petition circulators to personally witness each signature and to sign an affidavit to that effect. Nat'l Conf. of State Legis., *Laws Governing Petition Circulators*, http://www.ncsl.org/legislatures-elections/elections/laws-governing-petition-circulators.aspx (last accessed June 25, 2012). Asking a supporter to mail in a signature at a later date is thus out of the question for at least these efforts.

3

505 U.S. 672, 676, 683–85 (1992) (upholding ban on in-person solicitation of money); *United States v. Kokinda*, 497 U.S. 720, 724, 733 (1990) ("[T]he single issue before us [is whether] the Government's prohibition of *solicitation* on postal sidewalks [is] *unreasonable*?"). Thus, while we can only commend the Postal Service for so assiduously following our directions, the Service may conclude, on further reflection, that the present compromise causes more confusion and disruption than it abates. In that case, the Service may decide to do what is sensible and permit the entire signature-gathering encounter—for that would surely not be unreasonable.