# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 7, 2020          Decided June 9, 2020

No. 19-5168

ANATOL ZUKERMAN AND CHARLES KRAUSE REPORTING, LLC,
A D.C. LIMITED LIABILITY COMPANY,
APPELLANTS

v.

UNITED STATES POSTAL SERVICE,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-02131)

*Daniel S. Guarnera* argued the cause for appellants. With him on the briefs were *K. Chris Todd* and *Geoffrey M. Klineberg*.

*Joshua M. Salzman*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief was *Daniel Tenny*, Attorney.

Before: GRIFFITH and RAO, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: In 2015, Plaintiff-Appellants Anatol Zukerman and Charles Krause Reporting, LLC (together "Zukerman"), filed a complaint against the United States Postal Service ("USPS" or "Postal Service") contending that USPS's custom postage program violated the prohibition against viewpoint discrimination under the First Amendment. Zukerman's First Amended Complaint alleged that the Postal Service, through its vendor Zazzle, rejected his custom postage design because it was incompatible with the program's ban on "political" designs, even as it accepted other custom postage designs with obvious political content.

In 2018, as the parties were completing discovery and nearing summary judgment, the Postal Service adopted a new policy (the "2018 Rule") covering custom postage. The 2018 Rule deems custom postage designs acceptable only if they are "commercial" or "social" and exclude any content that is "political." In response to USPS's adoption of this new policy, Zukerman filed an unopposed Supplemental Complaint "incorporat[ing] by reference every allegation" from his First Amended Complaint and further alleging that the 2018 Rule is unconstitutional on its face. The District Court granted the Government's motion to dismiss Zukerman's viewpoint discrimination claim as moot and his challenge to the 2018 Rule for failure to state a claim. On appeal, the Government challenges our jurisdiction to address Zukerman's claims on the ground that they are moot. We disagree. Zukerman's Supplemental Complaint raises two challenges to the Postal Service's current policies covering custom postage and neither claim is moot.

First, Zukerman's Supplemental Complaint incorporates the allegation that he suffers "ongoing" viewpoint discrimination. The complaint alleges that, under the pre-2018

regime, the Postal Service discriminated in selecting certain political designs in the custom postage program. It alleges further that, under the 2018 Rule, the Postal Service now recognizes these already-printed designs as valid custom postage, even as Zukerman's political design is barred from the forum. This aspect of Zukerman's claim is not moot. The challenged conduct continues, its effects persist, relief is possible, and, therefore, the court has jurisdiction.

Second, in a recently filed letter to this court, the Postal Service asserted that it "has determined that the Customized Postage program should be terminated and has taken steps to effectuate that decision." USPS 28(j) Letter (May 4, 2020). The Postal Service claims that this development "bears directly on the continuing justiciability of" Zukerman's challenge to the 2018 Rule. *Id.* This remains to be seen. At this point, however, the Postal Service has not met its "heavy burden" of making it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). Any claim by the Postal Service that the termination of the custom postage program has "completely and irrevocably eradicated the effects" of the 2018 Rule can be addressed by the District Court on remand. *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979).

Because the District Court dismissed Zukerman's viewpoint discrimination claim as moot, it never reached the merits. We therefore remand this claim to be addressed by the District Court in the first instance. However, we reverse the District Court's dismissal of Zukerman's facial challenge to the 2018 Rule. The rule's blanket ban on "political" content fails the "objective, workable standards" test articulated by the Supreme Court in *Minnesota Voters Alliance v. Mansky*, 138

S. Ct. 1876, 1891 (2018). Therefore, we hold that the contested rule is unconstitutional.

## I. BACKGROUND

Because the District Court granted the Postal Service's motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), "we construe the complaint 'liberally,' granting [Zukerman] 'the benefit of all inferences that can be derived from the facts alleged.'" *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)). The facts recounted here are drawn from Zukerman's Supplemental Complaint, which "incorporate[s] by reference every allegation in [his] First Amended Complaint." Suppl. Compl. ¶ 1, Joint Appendix ("J.A.") 172.

### A. The Postal Service's Custom Postage Program

Since about 2005, the Postal Service has offered its customers the opportunity to create customized postage. *See* Customized Postage, 70 Fed. Reg. 21,821 (Apr. 27, 2005) (continuing a trial program). The basic idea of custom postage is simple and (by now) familiar: You can navigate to a website of an authorized third-party vendor, upload a custom design including text or images, pay a fee, print your custom stamps – which are, strictly speaking, customized evidence of pre-payment, not stamps – and use them to send first class mail and other USPS products. For example, a couple might create a custom design based on their engagement photo and use the postage to send save-the-date cards.

From the outset, the Postal Service sought to use the custom postage program to generate revenue without entangling itself in controversy or exposing itself to legal liability. *See, e.g.*, Br.

for Appellee at 4-6 (summarizing this history). To that end, the Postal Service has adopted policies to regulate the content that customers may include on their custom postage designs. In this case, Zukerman attempted to create custom postage based on his political artwork twice – first in 2015 under a now-superseded policy, and again in 2018 under still-current regulations.

1. *The Postal Service's 2015 Policy*

In 2015, the Postal Service established content requirements for custom postage by writing them into contracts with vendors. At the time, Zazzle was an authorized third-party vendor. According to a contract between Zazzle and the Postal Service, Zazzle agreed "to establish and maintain an image control process which will ensure that all images appearing in Customized Postage Products . . . conform in every respect to the Statement of Purpose and Standardized Image Guidelines" attached to the contract. J.A. 125.

The Postal Service intended these Standardized Image Guidelines to "maintain neutrality on religious, social, political, legal, moral, [and] other public issues" and prevent the custom postage program from becoming a "public forum." J.A. 130. To that end, the Standardized Image Guidelines required Zazzle to reject any content, "regardless of the viewpoint expressed," that was "[p]artisan or political," including "content or images supporting or opposing election of any candidate(s) to any federal . . . governmental office." J.A. 130-31.

Zazzle also developed its own content guidelines. *See* First Am. Compl. ¶¶ 14-16, J.A. 18-19. As a general matter, Zazzle prohibited "names of politicians[,] . . . political statements," and any other content that "may be considered offensive or be

controversial to others." *Id.* Ex. I, J.A. 67. For custom stamps in particular, Zazzle prohibited "any content . . . that in [its] sole judgment and discretion [it] believe[d] would be controversial or offensive," including any designs that "[i]ncorporate a . . . current or former . . . politician" or "[a]dvocate or protest any social, political, legal, moral or religious agenda." *Id.* Ex. J, J.A. 73-74.

## 2. *The Postal Service's 2018 Rule*

In December 2017, the Postal Service finalized new regulations to "standardize and formalize [the] requirements" of the custom postage program, and these requirements took effect on May 15, 2018. *See* Customized Postage Products, 82 Fed. Reg. 60,117, 60,118 (Dec. 19, 2017) (codified at 39 C.F.R. § 501), J.A. 179, 180 ("2018 Rule"). The Postal Service explained that, under the old policy, "the inconsistency of publicly available provider content guidelines . . . caused confusion over Customized Postage products." J.A. 180. To address that problem, the 2018 Rule prohibits authorized vendors from using any other eligibility criteria and requires them to make the Postal Service's criteria available to their customers. *See* 39 C.F.R. § 501.21(c)(1), (2)(i).

The 2018 Rule specifies that "[a]ny content not identified by the Eligibility Criteria is prohibited," *id.* § 501.21(b), and then sets forth the following requirements:

(1) Images or text must be "commercial" or "social," as defined below:

(i) *Commercial* means intended for no purpose other than the sale of goods or services in commerce.

(ii) *Social* means promoting or depicting people, animals, items, or events commonly associated with community relations or companionship and likely to generate invitations, announcements, notices, thank-you notes, RSVPs, or similar correspondence.

(2) Acceptable commercial or social images or text must not contain content that is unsuitable for all-ages audiences, including but not limited to:

. . . .

(iii) Any depiction of political, religious, violent or sexual content . . . .

39 C.F.R. § 501.21(b)(1)(i)-(ii), (b)(2)(iii).

In sum, the 2018 Rule says that "if proposed content is not a commercial or social image that is suitable for all-ages audiences, it is not eligible." J.A. 180. And if a proposed design contains "[a]ny depiction of political . . . content," it is "not suitable for all-ages audiences" and is, therefore, ineligible. If a vendor cannot determine whether a proposed design is eligible, it may seek clarification from the Postal Service. *See* 39 C.F.R. § 501.21(c)(2)(ii). In all events, however the Postal Service "reserves the right to determine independently" whether a proposed design is acceptable under the 2018 Rule. *Id.* § 501.21(b)(4).

### B. Factual and Procedural Background

#### 1. *Zukerman's First Amended Complaint*

As mentioned above, Plaintiff-Appellants are Anatol Zukerman, an artist, and Charles Krause Reporting, LLC, a company that operates an art gallery that works with Zukerman. First Am. Compl. ¶¶ 5-6, J.A. 16. In July 2013, the gallery held an exhibition of Zukerman's work that included his drawing of "Uncle Sam being strangled by a snake labeled *Citizens United* and configured as a dollar sign." *Id.* ¶ 17, J.A. 19. After the exhibition, Zukerman decided to create custom postage based on this *Citizens United* drawing to "encourage the sale of the art and to raise awareness about what [he] perceived as the harm caused by the [Supreme Court's] decision." *Id.* ¶ 18, J.A. 20.

On April 27, 2015, Zukerman ordered 40 custom stamps from Zazzle, an authorized vendor. *Id.* ¶ 20, J.A. 20. Zukerman's design reproduced his *Citizens United* drawing and included a caption stating that "Democracy Is Not for Sale." Here is an image of the custom postage Zukerman ordered:



First Am. Compl. ¶ 20, J.A. 20.

Later that day, Zazzle emailed Zukerman to say that it had canceled his order because his design was "in conflict with [applicable] content guidelines." *Id.* ¶ 22, J.A. 21. In a follow-up email, Zazzle explained that Zukerman's design was "politically oriented," and, therefore, at odds with the "Appropriate Use Guidelines" that "prohibit[] the printing of any postage with content that is primarily partisan or political in nature." *Id.* ¶ 23, J.A. 21.

"Zukerman then searched Zazzle's online marketplace—which made other users' customized postage designs available for purchase—and identified multiple designs with political themes." Br. for Appellants at 5. For example, Zukerman found custom postage expressing support for 2016 presidential candidates including Ted Cruz, Bernie Sanders, Jeb Bush, Hillary Clinton, and Donald Trump. First Am. Compl. ¶¶ 24-25, J.A. 21-22. Here are just two of the custom political designs that Zazzle allegedly "printed and offered for sale":

 

*Id.* ¶ 24, J.A. 22.

On December 9, 2015, Zukerman and Charles Krause Reporting, LLC, filed a lawsuit against the United States Postal Service. Zukerman's First Amended Complaint – filed with leave of the court in June 2016 – outlines the events described above and alleges that the Postal Service violated the Constitution by permitting Zazzle to engage in both content and viewpoint discrimination. *Id.* ¶ 2, J.A. 15. Most relevant

here, Zukerman contends that "[i]n light of the decisions Zazzle made to print and promote the sale to the public of partisan and political stamps of others, including stamps advocating the election of Cruz, Bush, Trump, and Clinton, USPS's actions have also permitted Zazzle to engage in unlawful *viewpoint* discrimination." *Id.* ¶ 44, J.A. 28.

Zukerman's First Amended Complaint repeatedly describes the Postal Service's viewpoint discrimination as "ongoing" or "contin[uing]." *See, e.g., id.* ¶ 2, J.A. 15 ("By permitting Zazzle to engage in . . . viewpoint discrimination, USPS has violated the Constitution . . . . [Zukerman] ha[s] been injured by these unconstitutional actions, and will continue to be injured in the future unless this Court requires USPS to stop violating the Constitution . . . ."); *id.* ¶ 27, J.A. 23 ("[Zukerman] face[s] an ongoing injury because of USPS's policy and practice of . . . viewpoint discrimination."); *see also id.* ¶ 44, J.A. 29 (alleging that his injuries "will continue indefinitely" unless the court intervenes).

In his prayer for relief, Zukerman sought, among other things, an injunction prohibiting "USPS from continuing to engage in the aforesaid unlawful . . . viewpoint discriminatory conduct, practice, and policy." J.A. 30. Zukerman also sought relief from specific aspects of the policy in place in 2015. *See id.*

After the District Court denied the Postal Service's initial motion to dismiss for lack of jurisdiction (on grounds not at issue here), the case proceeded to discovery. On May 15, 2018, as the case neared summary judgment, the Postal Service's 2018 Rule took effect and Zazzle lost its authorization to sell custom postage products. *See* Suppl. Compl. ¶¶ 2, 4, J.A. 172, 174.

11

2. *Zukerman's Supplemental Complaint*

On July 13, 2018, Zukerman filed a motion for leave to supplement his pleadings under Federal Rule of Civil Procedure 15(d). *See* Pls.' Mot., ECF No. 48. The Postal Service did not oppose Zukerman's motion "on the understanding that [Zukerman] proffer[s] 'a solely facial challenge' to 'the new regulations' restrictions on political speech,' and [Zukerman] 'agree[s] that no further discovery is necessary in light of [his] facial challenge.'" Def.'s Non-Opp'n to Pls.' Mot., ECF No. 50, at 2 (quoting Pls.' Mot., ECF No. 48, at 1, 2). On July 18, 2018, the District Court granted Zukerman's unopposed motion. The court also granted the parties' joint motion to stay proceedings on Zukerman's then-pending motion for summary judgment and the Postal Service's anticipated opposition and cross-motion.

Zukerman's Supplemental Complaint first "incorporate[s] by reference every allegation in [his] First Amended Complaint." Suppl. Compl. ¶ 1, J.A. 172. Zukerman then alleges that, in late June and early July of 2018, he submitted two custom postage designs to Stamps.com, an authorized vendor under the 2018 Rule. *See id.* ¶¶ 5-9, J.A. 174-75. Zukerman's designs were "substantively identical to the design [he] submitted to Zazzle . . . , except that in addition to the words 'Democracy is Not for Sale,' [one] design included the text 'But This Artwork Is!'" and the name of the gallery. *Id.* ¶ 6, J.A. 174. Stamps.com rejected both because they did not meet the company's "content guidelines." *Id.* ¶¶ 7, 9, J.A. 175. Zukerman alleges that, because the 2018 Rule establishes impermissible content requirements for all custom postage vendors, it violated his First Amendment rights by "causing Stamps.com to reject [his] designs." *Id.* ¶ 10-11, J.A. 176.

### 3. *The District Court's Decision*

On April 26, 2019, the District Court granted the Postal Service's motion to dismiss the case pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *See Zukerman v. USPS*, 384 F. Supp. 3d 44 (D.D.C. 2019).

First, the District Court held that Zukerman's viewpoint discrimination claim was moot because "USPS has rescinded and replaced the [2015 policy] with the [2018 Rule], so any challenge to the constitutionality of the [2015 policy] is now moot." *Id.* at 54. The court rejected Zukerman's argument that the claim falls in the voluntary cessation exception to mootness because his injury is ongoing and has not, therefore, been completely and irrevocably eradicated by intervening events. *See id.* at 57-58. The court reasoned that the "vestiges of the previous enforcement regime do[] not mean that USPS has failed to close the previous forum or, relatedly, that [Zukerman's] injury is ongoing." *Id.* at 58. Finally, the court held that it would not decide Zukerman's challenge to the 2015 policy for "practical considerations," even if his claim were not moot. *Id.* at 58-59.

Second, the District Court held that the 2018 Rule was constitutional on its face. The court found that the custom postage program created a nonpublic forum. *Id.* at 60-63. It then held that the challenged ban on "political" content was reasonable and (thus) constitutional. *See id.* at 63-67. The court reasoned that, unlike the ban on "political" apparel at polling places struck down in *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018), the Postal Service's 2018 Rule provides "objective, workable standards." *See Zukerman*, 384 F. Supp. 3d at 63-65. In the court's view, the 2018 Rule provides "sufficiently clear guidance on what can come in and what must stay out," *Zukerman*, 384 F. Supp. 3d at 67, because

the ban on "political" content is "anchored by both the definitions [of 'commercial' and 'social'] and the list of exclusions," *id.* at 64.

In sum, the District Court dismissed the viewpoint discrimination claims "originally set forth in [Zukerman's] First Amended Complaint as moot" and dismissed the facial First Amendment challenge to the 2018 Rule "set forth in [Zukerman's] Supplemental Complaint for failure to state a claim." *Id.* at 67. The court also denied as moot Zukerman's motion for summary judgment. *Id*. Zukerman filed a timely notice of appeal.

### 4. *Post-Argument Developments*

On February 5, 2020, two days before oral argument, the Postal Service filed a letter explaining that it was "currently re-evaluating its Customized Postage Program" and would notify the court of any developments. USPS 28(j) Letter (Feb. 5, 2020). On May 4, 2020, the Postal Service filed a second letter stating that "the Postal Service has determined that the Customized Postage program should be terminated and has taken steps to effectuate that decision." USPS 28(j) Letter (May 4, 2020). This letter indicates that "the Postal Service has terminated the authorization of the last remaining vendor participating in the program (*i.e.*, Stamps.com), effective June 16, 2020." *Id.* The Postal Service has also submitted a request, pursuant to 39 U.S.C. § 3642 and 39 C.F.R. §§ 3040.130-.135, seeking to have the Postal Regulatory Commission remove customized postage from the "Mail Classification Schedule." USPS 28(j) Letter (May 4, 2020). As of the date of this opinion, the Commission has not taken any definitive action on the Postal Service's request.

## II. ANALYSIS

### A. Standard of Review

We review *de novo* the District Court's dismissal of both Zukerman's viewpoint discrimination claim for lack of jurisdiction and his challenge to the 2018 Rule for failure to state a claim. *See True the Vote, Inc. v. IRS*, 831 F.3d 551, 555 (D.C. Cir. 2016) (explaining that review of 12(b)(6) dismissals is *de novo* and that review of 12(b)(1) dismissals is *de novo* when, as here, the District Court relies "on the complaint standing alone" (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992))).

As noted above, in reviewing dismissals under Rules 12(b)(1) and 12(b)(6), we assume the truth of Zukerman's allegations and "construe the [Supplemental Complaint and the First Amended Complaint it incorporates] 'liberally,' granting [Zukerman] 'the benefit of all inferences that can be derived from the facts alleged.'" *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

To prevail on its Rule 12(b)(1) motion to dismiss for lack of jurisdiction, the Government, as the party urging mootness, bears the "heavy burden" of establishing that the case is moot. *Honeywell Int'l, Inc. v. Nuclear Regulatory Comm'n*, 628 F.3d 568, 576 (D.C. Cir. 2010). In contrast, to survive the Government's Rule 12(b)(6) motion to dismiss for failure to state a claim, Zukerman must show that his complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

**B. Mootness**

The Postal Service argues that the court lacks jurisdiction to consider Zukerman's viewpoint discrimination claim because the matter is moot. The Government also suggests that recent developments have cast doubt on our jurisdiction to decide Zukerman's challenge to the 2018 Rule. We disagree on both counts.

"Article III of the Constitution limits our jurisdiction to 'actual, ongoing controversies.'" *Foretich v. United States*, 351 F.3d 1198, 1210 (D.C. Cir. 2003) (quoting *Honig v. Doe*, 484 U.S. 305, 317 (1988)). This "case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)) (internal quotation marks omitted).

"A lawsuit becomes moot—and is therefore no longer a 'Case' or 'Controversy'—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Almaqrami v. Pompeo*, 933 F.3d 774, 779 (D.C. Cir. 2019) (quoting *Chafin*, 568 U.S. at 172). This happens "only when it is impossible for a court to grant 'any effectual relief whatever' to the prevailing party." *Knox v. Serv. Emps. Int'l Union*, 567 U.S. 298, 307 (2012) (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Chafin*, 568 U.S. at 172 (quoting *Knox*, 567 U.S. at 307-08) (internal quotation marks omitted).

In this case, it is the Postal Service's own actions that have arguably rendered Zukerman's viewpoint discrimination claim moot. "[A]s a general rule, 'voluntary cessation of allegedly

illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot.'" *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953)). If the rule were otherwise, "[a] defendant [would be] free to return to his old ways," and that, "together with a public interest in having the legality of the [disputed] practices settled, militates against a mootness conclusion." *W.T. Grant Co.*, 345 U.S. at 632.

The Supreme Court has made it clear that a court may not conclude that a defendant's voluntary cessation of disputed conduct renders a case moot unless "the party urging mootness demonstrates that (1) 'there is no reasonable expectation that the alleged violation will recur,' and (2) 'interim relief or events have completely or irrevocably eradicated the effects of the alleged violation.'" *Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997) (quoting *Davis*, 440 U.S. at 631); *see also Initiative & Referendum Inst. v. USPS*, 685 F.3d 1066, 1074 (D.C. Cir. 2012) (same). As noted above, the party urging mootness bears a heavy burden. The Government has not met its burden in this case.

1. *Zukerman's Viewpoint Discrimination Claim Is Not Moot Because His Relevant Injury Is Ongoing*

In any mootness inquiry, we must first "defin[e] the wrong that the defendant is alleged to have inflicted." *Clarke v. United States*, 915 F.2d 699, 703 (D.C. Cir. 1990) (en banc). Zukerman contends that he suffers from "ongoing" viewpoint discrimination, an injury that "is the same today as it was in 2015: other speakers are *still* allowed to express their political beliefs on [previously printed] customized postage, while [Zukerman] *still* cannot convey [his] own political message in

the same forum." Reply Br. for Appellants at 15-16. The Government does not directly contest this.

Zukerman also alleges that that his injury was initially inflicted in 2015 under a now-superseded policy administered by a since-deauthorized vendor. It is clear, therefore, that the Postal Service's voluntary actions have brought an end to some aspects of Zukerman's claimed injury and have, for that reason, rendered some of Zukerman's requested relief moot. Indeed, Zukerman concedes as much. He agrees, for instance, that a court can no longer provide him effectual relief by prohibiting the Postal Service from enforcing a policy that is no longer on the books. *See* Br. for Appellants at 39; *see also Initiative & Referendum Inst.*, 685 F.3d at 1074 (explaining that it is generally not appropriate to provide injunctive or declaratory relief from a superseded law).

Nevertheless, it is well understood that "the fact that one aspect of a lawsuit becomes moot does not automatically deprive a court of jurisdiction over remaining, live aspects of the case." *Foretich*, 351 F.3d at 1210; *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 196 (2000) (Stevens, J., concurring). As explained above, Zukerman contends that "USPS has continued to cause [his] viewpoint-discrimination injury by permitting political messages to circulate on previously printed customized postage, while having denied [him] the same opportunity." Br. for Appellants at 41. Zukerman maintains that *this* aspect of his injury persists and can be relieved by an appropriate court order. *See id.* at 39. We agree.

Zukerman's Supplemental Complaint clearly alleges that the Postal Service's viewpoint discrimination remains "ongoing," even though the 2018 Rule has replaced the 2015 policy. The reason, put simply, is that Zukerman's unopposed

supplemental pleadings, filed after the 2018 Rule was already in operation, "incorporate" his earlier allegations that he suffers viewpoint discrimination that is "ongoing" and "will continue indefinitely." *See* Suppl. Compl. ¶ 1, J.A. 172 (incorporating, *inter alia*, First Am. Compl. ¶¶ 27, 44, J.A. 23, 29). Therefore, Zukerman's supplemental pleadings indisputably carry forward, from 2015 to 2018, the allegation that the Postal Service allowed Zazzle to print political designs and continues even under the 2018 Rule to recognize these designs as valid custom postage, all the while rejecting Zukerman's design for having that same feature. In sum, Zukerman alleges that (1) he suffered unconstitutional viewpoint discrimination beginning in 2015 and (2) he continues to suffer it because the Postal Service still recognizes other previously-issued political designs as valid postage, a practice that has outlived the 2015 policy.

In this case, correctly "defining the wrong" Zukerman alleges is the dispositive step. *Clarke*, 915 F.2d at 703 (en banc). Because the Postal Service's voluntary conduct is the only intervening event that even arguably renders the case moot, we apply the two-part voluntary cessation test. *See, e.g.*, *Davis*, 440 U.S. at 631. As the record makes clear, Zukerman's claim of ongoing viewpoint discrimination is emphatically not moot due to USPS's voluntary cessation. This is so because the Postal Service has not carried its heavy burden of demonstrating that its voluntary actions have completely eradicated the effects of its alleged violations.

It is clear from Zukerman's allegations, which we accept as true and construe in his favor, that the effects of the alleged violation persist. For one thing, Zukerman still does not have his stamps. For another, there is no indication that the 2018 Rule invalidated any postage issued under the prior policy. *Cf. Pulphus v. Ayers*, 909 F.3d 1148, 1152 (D.C. Cir. 2018)

(holding that a claim for injunctive relief was moot when a 2016 art competition was over, the other 2016 winners were no longer displayed anywhere that the defendant controlled, and the 2017 winners had been put up instead). Nor is there any suggestion that the Postal Service has recalled or withdrawn recognition from stamps issued in violation of the then- or now-applicable guidelines. As a result, this case fits comfortably within our precedents finding that a defendant's voluntary actions do not moot a case where "some tangible, concrete effect, traceable to the injury, and curable by the relief demanded, clearly remain[s]." *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1019 (D.C. Cir. 1991).

In other words, Zukerman's viewpoint discrimination claim is not moot – through voluntary cessation or otherwise – because it is clearly not *impossible* for the court to provide "any effectual relief whatever." *Knox*, 567 U.S. at 307 (internal quotation marks and citation omitted). A court could in principle "grant [Zukerman] . . . concrete, tangible relief," Br. for Appellants at 39, like an order to print his *Citizens United* design, *see id.* at 37-38 (drawing on *Sefick v. Gardner*, 164 F.3d 370, 371-72 (7th Cir. 1998)), or an order to make reasonable efforts to decertify political designs issued under the old policy rather than treat them as valid custom postage, *see id.* at 41-42. In its brief, the Postal Service raises doubts about whether the relief Zukerman seeks is workable. *See* Br. for Appellee at 35-37. But ultimately "that is a matter relating to the exercise rather than the existence of judicial power," *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982), and should be taken up after Zukerman proves that he is entitled to relief on remand.

The Government's remaining arguments are similarly unpersuasive. The Postal Service argues that Zukerman's claim is moot because he has received all the relief he specifically

identified in his pleadings. Br. for Appellee at 27-29. Even assuming that is the proper standard by which to judge mootness, however, we find that Zukerman's original request for an injunction prohibiting "USPS from continuing to engage in . . . viewpoint discriminatory conduct, practice, and policy" suffices to refute the Government's claim. J.A. 30.

In addition, the Government expresses doubt that "there is any meaningful ongoing use" of "previously authorized political postage." Br. for Appellee at 30. The Government also raises inchoate doubts about whether Zazzle's alleged conduct constitutes viewpoint discrimination. *Id.* at 31. These arguments are premature, given the posture of this case. Because the District Court has not made any factual findings, we accept Zukerman's allegations as true and draw all reasonable inferences in his favor. The Government will have the opportunity to litigate these matters on remand, as it sees fit.

Finally, we reject the Government's contention that our conclusion might "disable the Postal Service from neutrally enforcing its content restriction in the present" or "sharply curtail[]" its ability to close or transform a forum. Br. for Appellee at 32-33. The first thing to be said about this is that viewpoint discrimination is prohibited in all forums, *see Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828-30 (1995), so the justiciability of Zukerman's viewpoint discrimination claim does not depend on any specific assumption about the nature of the custom postage forum. Beyond that, the Government's arguments largely depend on the mistaken premise that the Postal Service's disputed conduct has ceased. The Government has not shown this.

Zukerman alleges that the Postal Service continues to give authoritative recognition to some political speech submitted

under the prior policy, even as Zukerman's speech submitted under both the old and new policies is barred. In this situation, where the Government gives authoritative permission to certain individuals to speak in a forum and that permission survives a change in forward-looking policy, we have no difficulty in concluding that a challenge to the nature of the Government's ongoing authorization remains justiciable. This conclusion will not prevent or hinder the Government from changing course in more routine scenarios where once-authorized speeches have already been given, or once-authorized posters have been taken down, or the like.

In sum, Zukerman's challenge to the Postal Service's viewpoint discrimination is not moot because Zukerman's Supplemental Complaint alleges that USPS has not eradicated the effects of its past viewpoint discrimination and, by the same token, that its viewpoint discrimination continues still. At this juncture, we cannot say the past is dead; we cannot even say it is past.

2. *The District Court's Reliance on "Practical Considerations" Was Error*

In declining to address Zukerman's viewpoint discrimination claim, the District Court said:

> Even if [Zukerman's] original claims were justiciable, practical considerations would lead the Court to assess the constitutionality of the current Regulations only. The D.C. Circuit has counseled that "precedent and practicality direct us to deal with the world as it is now, not as it was when the case was filed."

*Zukerman*, 384 F. Supp. 3d at 58 (quoting *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth*., 901 F.3d 356, 363 (D.C. Cir. 2018)). This was error. As we explained above, "the world as it is now" in this case includes Zukerman's claim that the Postal Service's alleged viewpoint discrimination is "ongoing." It did not end with the adoption of the 2018 Rule. Therefore, the claim is not moot.

Furthermore, the Supreme Court has made it very clear that "a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)) (internal quotation marks omitted); *see also Sprint Commc'ns, Inc. v. Jacobs,* 571 U.S. 69, 77 (2013). It is hardly surprising, then, that for almost two hundred years, we have followed the principle that federal courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821). The District Court therefore erred in looking to "practical considerations," *Zukerman*, 384 F. Supp. 3d at 58, in declining to address Zukerman's viewpoint discrimination claim.

3. *Zukerman's Challenge to the 2018 Rule Is Not Moot Because USPS's Post-Argument Actions Do Not Make It "Absolutely Clear" That the Alleged Wrong Will Not Recur*

As explained above, the Postal Service recently "determined that the Customized Postage program should be terminated and has taken steps to effectuate that decision." USPS 28(j) Letter (May 4, 2020). So far, the Postal Service has terminated the last authorized vendor effective June 16, 2020, and filed a request with the Postal Regulatory Commission to

have the custom postage program removed from the "Mail Classification System." It is not clear from the Postal Service's letter what follows if this pending request is granted. But the Postal Service says that "this development bears directly on the continuing justiciability of this appeal" and suggests that "[t]his Court should not pass on the constitutionality of regulations that are not the source of any continuing injury to [Zukerman]." *Id.*

On the record before us, we cannot conclude that the Postal Service's post-argument actions have mooted Zukerman's challenge to the 2018 Rule or otherwise deprived us of jurisdiction. Most important, the challenged 2018 Rule remains in effect. *See Glob. Tel\*Link v. FCC*, 866 F.3d 397, 407 (D.C. Cir. 2017) (concluding that there was "absolutely no basis" for concluding that the FCC's voluntary actions mooted the case where the challenged Order was "still in force"). Therefore, the Postal Service's announced plans provide only "weak assurance" in a context in which the Postal Service bears a "heavy burden." *Payne Enters., Inc. v. United States*, 837 F.2d 486, 492 (D.C. Cir. 1988). In short, the Postal Service has not made it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 189 (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)).

In these circumstances, the appropriate course is to leave the question open for consideration on remand. *See Friends of the Earth*, 528 U.S. at 193-94 (declining to address a party's argument that the case had been mooted by events following the Fourth Circuit's decision because the question turned on "disputed factual matter[s]" that had "not [yet] been aired in the lower courts"). It is also "open to [the Postal Service] to show, on remand, that the likelihood of further violations is sufficiently remote to make injunctive relief unnecessary. This

is a matter for the trial judge." *Aladdin's Castle, Inc.*, 455 U.S. at 289 n.10 (quoting *Concentrated Phosphate Export Ass'n*, 393 U.S. at 203-04).

## C. The Merits of Zukerman's Viewpoint Discrimination Claim

We will remand Zukerman's viewpoint discrimination claim without lingering long over the merits. In view of the record before us, Zukerman's viewpoint discrimination claim appears to have merit. After all, Zukerman effectively alleges that "he was [(and is)] prevented from speaking [through the custom postage program] while someone espousing another viewpoint was [(and still is)] permitted to do so." *McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014). At first blush, then, these allegations pass the "most basic . . . test for viewpoint discrimination," which is "whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Matal v. Tam*, 137 S. Ct. 1744, 1766 (2017) (Kennedy, J., concurring in part and concurring in the judgment).

That said, we cannot responsibly decide the merits of Zukerman's viewpoint discrimination claims on the record before us. The Postal Service has not yet had an adequate opportunity to articulate or defend its position on the merits: it did not file or litigate a 12(b)(6) motion; the District Court granted the parties' joint motion to stay summary judgment proceedings before the Postal Service could file its opposition or cross-motion; and the parties did not fully brief the merits before this court. Therefore, we will adhere to "our general practice," *Mendoza v. Perez*, 754 F.3d 1002, 1020 (D.C. Cir. 2014), and remand the case. On remand, the District Court can further develop the record as necessary and then decide the merits of Zukerman's claims in the first instance.

**D. The Merits of Zukerman's Challenge to the 2018 Rule**

Finally, we turn to the merits of Zukerman's claim that USPS's 2018 Rule violates the First Amendment. We hold that the Postal Service's regulation banning custom postage designs containing "[a]ny depiction of political . . . content" cannot pass constitutional muster because it does not provide "objective, workable standards" to guide the exercise of the Government's discretion. The 2018 Rule is thus unconstitutional pursuant to the standards articulated by the Supreme Court in *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018).

"Our analysis of a restriction on speech on government property begins with the forum doctrine." *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.* (*AFDI*), 901 F.3d 356, 364 (D.C. Cir. 2018). "This approach divides government property into three categories, and the category determines what types of restrictions will be permissible." *Initiative & Referendum Inst.*, 685 F.3d at 1070. In this appeal, the parties do not challenge the District Court's holding that the Postal Service's custom postage program constitutes a "nonpublic forum," Br. for Appellee at 15-16 – that is, a "public property which is not by tradition or designation a public forum" for expressive activity, *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 322 (D.C. Cir. 2018).

Because "the government, 'no less than a private owner of property,' retains the 'power to preserve the property under its control for the use to which it is lawfully dedicated,'" *Mansky*, 138 S. Ct. at 1885 (quoting *Adderley v. Florida*, 385 U.S. 39, 47 (1966)), restrictions on speech in a nonpublic forum are subject to a "distinct," *id.*, and more "forgiving" standard of review, *id.* at 1888. "The government may reserve such a forum

'for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Id.* at 1885 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)).

In *Mansky*, the Supreme Court provided additional guidance on the test for "reasonableness" in this context. The Court explained that a rule limiting speech in a nonpublic forum is reasonable only if it is "capable of reasoned application." 138 S. Ct. at 1892. In other words, the government "must be able to articulate some sensible basis for distinguishing what may come in from what must stay out" under the rule. *Id.* at 1888. The government cannot meet that requirement, the Court explained, unless the rule in question provides "objective, workable standards" to guide a government official's exercise of discretion. *Id.* at 1891.

If a regulation on speech does not provide government decision-makers with objective, workable standards, the risk of "unfair or inconsistent enforcement," *id.*, and even "abuse" is "self-evident," *id.* (quoting *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987)). In addition, the Court observed, the risks of arbitrary or inconsistent enforcement will tend to undermine the very governmental interests that the regulation in question was meant to advance. *See id.*; *see also Initiative & Referendum Inst.*, 685 F.3d at 1073 ("A regulation is reasonable if it is consistent with the government's legitimate interest in maintaining the property for its dedicated use.").

The Court in *Mansky* applied these principles to a Minnesota law prohibiting individuals from wearing any "political badge, political button, or other political insignia" at polling places on Election Day. 138 S. Ct. at 1883 (quoting MINN. STAT. § 211B.11(1) (Supp. 2017)). The law assigned

certain poll workers the job of deciding what apparel was in and what was out. The Court found that Minnesota's "political apparel ban" sought to achieve a permissible end. *See id.* at 1886-88. However, the Court explained that a regulation limiting speech is required to "draw a reasonable line" in service of permissible ends. *Id.* at 1888. In the Court's view, "the unmoored use of the term 'political' in the Minnesota law" doomed it "to fail even this forgiving test." *Id.*

The fundamental problem with the Minnesota law, the Court found, was that the unqualified term "political" is too "expansive" to be capable of reasoned application. *Id.* For example, the term "can encompass anything 'of or relating to government[,]' . . . or anything '[o]f, relating to, or dealing with the structure or affairs of government, politics, or the state.'" *Id.* (second alteration in original) (first quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1755 (2002); then quoting AMERICAN HERITAGE DICTIONARY 1401 (3d ed. 1996)). Because the term "political" admits of such capacious readings, a blanket prohibition on "political" apparel has an "indeterminate scope." *Id.* at 1889. It provides no objective, workable standards.

The Court then explained why this indeterminate scope was a problem. "It is 'self-evident' that an indeterminate prohibition carries with it '[t]he opportunity for abuse,'" *id.* at 1891 (alteration in original) (quoting *Jews for Jesus, Inc.*, 482 U.S. at 576), even where some discretion is necessary and government officials "strive to enforce the [rule] in an evenhanded manner," *id.* In particular, a blanket ban on "political" expression does not provide government decision-makers with the kinds of "objective, workable standards" that are necessary to ensure that their "own politics [do not] shape [their] views on what counts as 'political.'" *Id.* at 1891. Without such standards, the risk of "unfair or inconsistent

enforcement" – and the concomitant risk to the state's interest "in maintaining a polling place free of distraction and disruption" – is obvious. *Id.*

The Court also considered the authoritative "interpretations [that Minnesota] . . . provided in official guidance and representations to th[e] Court." *Id.* at 1888. The Court found that these interpretations could not "clarify[] the indeterminate scope of the political apparel provision" or otherwise "save[]" the law. *Id.* at 1889. Indeed, the Court found that the state's "haphazard interpretations" introduced their own line-drawing problems and generally proved incapable of "reasoned application." *Id.* 1888, 1892. The Court's opinion recounts the state's struggles "to articulate some sensible basis for distinguishing what may come in from what must stay out" under various, putatively narrowing interpretations, *see id.* at 1888-91 – struggles that went "beyond close calls on borderline or fanciful cases," *id.* at 1891.

The Court summarized its holding in *Mansky* by saying that "the unmoored use of the term 'political' in the Minnesota law, combined with haphazard interpretations the State has provided in official guidance and representations to this Court, cause Minnesota's restriction to fail even th[e] forgiving test" that governs speech regulations in nonpublic forums. *Id.* at 1888. The Court's use of the phrase "combined with" suggests that the state's haphazard efforts were essential to the holding, but that is clearly not so. As explained above, the Court amplified the problem with the term "political" before saying that the State's efforts could not "clarify" or "save" the "indeterminate scope of the political apparel provision." *Id.* at 1889. That is, the "unmoored use of the term 'political'" was itself a critical problem.

This court's decisions applying *Mansky* confirm this reading of the case. In *AFDI*, the court explained that the problem with Minnesota's political apparel ban was that it "did not define the term 'political,' which in the Court's view was *simply too broad*." 901 F.3d at 371 (emphasis added). "The crux of the Court's decision," we said, "was that the State's discretion in enforcing the statute had to be 'guided by objective, workable standards.' Because the unqualified ban on 'political' apparel did not provide those standards, it was unreasonable." *Id.* at 372 (quoting *Mansky*, 138 S. Ct. at 1891); *see also id.* (explaining that courts must determine whether rules limiting speech in nonpublic forums are "so *broad* as to provide [the government] with no meaningful constraint" (emphasis added)); *Archdiocese of Wash.*, 897 F.3d at 330 (explaining that, under *Mansky*, "a restriction may also be unreasonable if it is unclear what speech would be swept in").

With these principles in mind, we turn to the case at hand. Here, because "[t]he text of the [2018 Rule] makes no distinction based on the speaker's political persuasion," *Mansky*, 138 S. Ct. at 1886, the question before the court is whether the 2018 Rule's ban on custom postage with "political" content is "reasonable in light of the purpose served by the forum," *Mansky*, 138 S. Ct. at 1886 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)) (internal quotation marks omitted). In addition, because the parties do not dispute the purposes of the custom postage forum (*i.e.*, to generate revenue and avoid misattribution and political entanglement), *see* Br. for Appellee at 16-17; *Zukerman*, 384 F. Supp. 3d at 65, or that USPS may regulate speech to achieve those ends as a general matter, the dispositive question is whether the 2018 Rule provides objective, workable standards of the sort that *Mansky* requires.

We hold that it does not. The Postal Service's 2018 Rule banning "[a]ny depiction of political . . . content" in custom postage products raises the same problem the Court diagnosed in *Mansky*. Here, as in *Mansky*, the challenged regulation tasks government decision-makers with deciding what can come in and what must stay out. Here, as there, the challenged regulation uses the ill-defined term "political" to establish a blanket content exclusion. And here, as there, the ill-defined term "political" cannot provide the "objective, workable standards" that *Mansky* requires. Without such standards, the Postal Service's content reviewers' "own politics may shape [their] views on what counts as 'political.'" *Mansky*, 138 S. Ct. at 1891. "And that is a serious matter when the whole point of the exercise is to prohibit the expression of political views." *Id.* As in *Mansky*, moreover, the risk of unfair or inconsistent enforcement remains a real threat to undermine the Postal Service's stated interest in avoiding entanglement in politics. In sum, the 2018 Rule's blanket ban on "political" content is "simply too broad" to guide the discretion of the Postal Service's content reviewers. *AFDI*, 901 F.3d at 371.

We understand that "[p]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Mansky*, 138 S. Ct. at 1891 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). But here, as in *Mansky*, the Government's "difficulties with its restriction go beyond close calls on borderline or fanciful cases." *Id.*

For instance, counsel for the Government struggled at oral argument to explain whether stamps depicting seemingly "commercial" ad campaigns (*e.g.*, a Nike campaign featuring Colin Kaepernick, or a Fox News campaign featuring Tucker Carlson Tonight, or a Ben & Jerry's campaign promoting "Pecan Resist") would be eligible under the 2018 Rule. *See*

Oral Argument at 30:20-33:20, 34:05-34:45, 38:10-40:45; *see also Mansky*, 138 S. Ct. at 1890 (explaining a related problem created by businesses with "recognizable political views," including Ben & Jerry's). Counsel for the Government had similar trouble explaining whether custom stamps based on social events like weddings (gay or straight) or stamps related to other "social" events whose existence or content is arguably political should be excluded under the 2018 Rule. *See* Oral Argument at 33:20-33:50, 34:47-35:52.

This is no surprise. After all, the 2018 Rule effectively inherits the problems of a blanket political apparel ban and it creates many more problems besides. "A rule whose fair enforcement requires [a government decision-maker] to maintain a mental index" of commercial or social designs that have any possible "political" resonances is "not reasonable." *Mansky*, 138 S. Ct. at 1889. Indeed, it would be difficult in these circumstances for the Postal Service's content reviewers *not* to let their "own politics . . . shape [their] views on what counts as 'political.'" *Id.* at 1891.

The Government tries to locate objective, workable standards in the 2018 Rule, but its efforts do not persuade us. The Government's principal argument is that USPS's use of the term "political" is not "unmoored" because the 2018 Rule defines the "commercial" and "social" content that is allowed, provides a list of express exclusions, and also excludes everything not expressly permitted. Br. for Appellee at 18-19, 23. The Government even contends that, in this regulatory structure, use of the expansive, undefined term "political" makes the overall rule more administrable because it requires

government decision-makers to exclude everything that even smacks of politics. *See id.* at 25.

These features of the 2018 Rule do not save it, because they do not make the ban on political content any more objective or workable. At most, the added structure of the 2018 Rule means that the political content ban will be implicated in fewer overall cases, because the Postal Service can reject some designs on other grounds. But even if this is true, it does not make the political exclusion *itself* any more administrable, and the political exclusion must be satisfied every time the Government approves a custom postage design. In countless cases, then, the Government's content reviewers will have enormous unguided discretion to adopt and apply their own (perhaps narrower, perhaps inconsistent) definitions of "political." The Government's decision to embrace the broadest meaning of "political" does not help, because the bounds of that concept are themselves indeterminate and disputed.

Next, the Government argues that the Court's holding in *Mansky* turned in part on the "haphazard interpretations" of the term "political" that the state had offered in guidance documents and in litigation. Br. for Appellee at 22-24 (quoting *Mansky*, 138 S. Ct. at 1888). As explained in detail above, however, the ill-defined term "political" was seen by the Court in *Mansky* as a critical problem – a problem that the state's authoritative interpretations could not overcome. *See AFDI*, 901 F.3d at 371; *Mansky*, 138 S. Ct. at 1888-89. The ill-defined term "political" is the problem here too.

The Government also contends that "[t]he decision in *Manksy* . . . must be understood in terms of the context where the apparel ban applied, and the consequences that flowed from noncompliance." Br. for Appellee at 24. This point is good as

far as it goes. It is true that the 2018 Rule does not reflect the same "difficult reconciliation" between "the right to engage in political discourse" and "the right to vote" that was at issue in *Mansky*. 138 S. Ct. at 1892 (quoting *Burson v. Freeman*, 504 U.S. 191, 198 (1992) (plurality opinion)). Given the stakes, *Mansky* compellingly illustrates why the government must adopt objective, workable speech restrictions, even in nonpublic forums. But the Court's decision did not turn on the stakes. Instead, the Court's holding turned on the fact that the challenged rule was not capable of reasoned application; that is the problem here too.

Finally, the Government argues that the Postal Service's 2018 Rule is at least as objective and workable as other restrictions on political speech that courts have upheld. *See* Br. for Appellee at 17 (citing *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974); *Greer v. Spock*, 424 U.S. 828 (1976); and *Bryant v. Gates*, 532 F.3d 888 (D.C. Cir. 2008)). We disagree. The decisions cited by the Government upheld rules that excluded "political advocates and forms of political advocacy" in more precise, objective, and workable terms. *Mansky*, 138 S. Ct. at 1885-86. Indeed, in *Mansky*, the Supreme Court approvingly cited two of the cases the Government relies on – *Lehman* and *Greer* – even as it struck down Minnesota's blanket ban on "political" apparel as unworkably broad. *See id.* Our decision goes no further than *Mansky* on this point.

In *Lehman v. City of Shaker Heights*, for instance, the Court held that a city could prohibit "political advertising on behalf of a candidate for public office." 418 U.S. 298, 299 (1974) (plurality opinion). In *Greer v. Spock*, the Court upheld a ban on "[d]emonstrations, picketing, sit-ins, protest marches, political speeches and similar activities" – and the "rigid[] enforce[ment]" of this ban to exclude "political campaign speech[es]" – on a military base. 424 U.S. 828, 831 (1976).

Finally, in *Bryant v. Gates*, this court upheld a ban on "political advertisements" in a military newspaper where "the context in which th[e] term ['political'] appears . . . makes clear that it relates specifically to elections and policy matters of concern to public officials." 532 F.3d 888, 893 (D.C. Cir. 2008) (explaining that the regulation specifically mentions campaigns, candidates, parties, lobbying of elected officials, and political issues); *see also id.* at 897 (finding the ban reasonable).

In all of these cases, the government could point to at least some limiting standards – for instance, the ordinary meaning of the term "advertising," informed by all-important context – to define the scope of the term "political" and render the prohibition on speech more objective and workable. *See also Archdiocese of Wash.*, 897 F.3d at 340 (Wilkins, J., concurring) (distinguishing a ban on "advertisements that 'promote or oppose any religion, religious practice or belief'" from a "general ban on 'religious' or 'political' speech"). In other words, the Court's decision in *Mansky* suggests that the step from a *blanket* ban on "political" content to a regulation that imposes some workable limits on the term "political" is a critical one. Our decision here reinforces that same conclusion.

The precedents discussed above underscore another point that the Court made in *Mansky*: the Government has not "set upon an impossible task." 138 S. Ct. at 1891. There, the Court noted that other states had regulated political speech at polling places "in more lucid terms" and invited Minnesota to adopt "a more discernable approach." *Id*. Here, too, the Postal Service remains free to craft a new rule that satisfies the requirements set forth in *Mansky* and the cases it draws on. But the 2018 Rule's blanket ban on "political" content does not provide government decision-makers with objective or workable guidance. For that reason, it cannot pass constitutional muster.

### III. Conclusion

For the reasons set forth above, we reverse the decision of the District Court and remand the case for further proceedings consistent with this opinion.